# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

CITY OF PENSACOLA,
a Florida municipal corporation,

      Plaintiff,

v.                                                            Case No.: _____

EMERALD COAST UTILITIES
AUTHORITY; U.S. DEPARTMENT OF
TRANSPORTATION, FEDERAL
AVIATION ADMINISTRATION; and
MICHAEL PETER HUERTA, in his official
capacity as Administrator of the Federal
Aviation Administration,

      Defendants.

_____/

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, City of Pensacola, sues Defendants, Emerald Coast Utilities
Authority; U.S. Department of Transportation, Federal Aviation Administration;
and Michael Peter Huerta in his official capacity as Administrator of the Federal
Aviation Administration, and alleges:

### Parties, Jurisdiction, and Venue

1.    This Court has jurisdiction over the parties and the subject matter
pursuant to 28 U.S.C. § 1331, because the action involves controversies arising
under the U.S. Constitution (Art. IV, cl. 2, the Supremacy Clause); federal aviation

statutes (including the Airport and Airway Improvement Act of 1982, 49 U.S.C. §§ 47101, *et seq.*); and regulations and policies of the Federal Aviation Administration ("FAA"), along with a specific remedy sought under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

2.      Plaintiff City of Pensacola ("City") is a Florida municipal corporation that owns and operates the Pensacola International Airport, which includes designated real property and infrastructure ("PNS" or "Airport Complex") regulated by the FAA.

3.      The City is the FAA-designated airport sponsor ("Airport Sponsor[1]"), as it receives federal financial assistance from the FAA to improve and operate PNS.

4.      Defendant Emerald Coast Utilities Authority ("ECUA") is a local government body, corporate and politic, created pursuant to Chapter 81-376, Laws of Florida.[2] ECUA is headquartered and provides certain utilities services in Escambia County, Florida, including the collection, delivery, and sale of water to its customers.

---

[1] An airport sponsor is the public agency that is authorized to own and operate the airport, to obtain property interests, to obtain funds, and to comply with all applicable requirements of current laws and regulations, both legally and financially. *FAA Order 5190.6B, Appendix Z, p. 315*, U.S. Dept. of Trans., Fed. Aviation Admin. (Sept. 30, 2009).

[2] ECUA was created as the Escambia County Utilities Authority. Its name was changed to the Emerald Coast Utilities Authority in 2004.

5.     Defendant FAA is an administration in the United States Department of Transportation with the authority to regulate civil aviation and airports in the United States, including PNS. Defendant Michael Peter Huerta is the Administrator of the FAA.

6.     The FAA is a party to this action because, as alleged more specifically below: (a) ECUA has demanded that the City convey to ECUA fee simple title to certain real property within the Airport Complex, but this real property is and has been encumbered by laws, rules, and grant assurances administered by the FAA and cannot be transferred or disposed of without FAA approval; and (b) because the City is asking the Court for a declaratory judgment to determine the City's obligations with respect to the FAA's statutes, regulations, and written policies that the FAA is requiring the City to apply to certain Airport Complex real property and ECUA activities thereon. Thus, the FAA has an interest in the subject matter of this action, and disposing of the action in the FAA's absence may impair or impede the FAA's ability to protect this interest or leave the FAA or the City subject to a substantial risk of incurring inconsistent obligations because of the interest. The FAA has not consented to be named as a party to this action.

7.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, because the City and ECUA are governmental bodies located within the Northern District of Florida, and because the events giving rise to this lawsuit occurred, and

the property that is the subject of this lawsuit is situated, within the Northern District of Florida.

Introduction and General Allegations

8.     There are three potable water production wells located within the Airport Complex: (1) the Hagler well, built by the City in 1958 ("Hagler Well"); (2) the Airport North well, built by the City in 1976 ("Airport North Well"); and (3) the Spanish Trail well, built in 1999 by ECUA on Airport Complex real property it has leased from the City since 1998 ("Spanish Trail Well") (collectively, the "Wells"). Also, there are pipelines and other infrastructure related to the delivery of water extracted at the Wells that are located within the Airport Complex (collectively, the "Infrastructure").

9.     The Hagler Well is located nearly one-half mile inside the Airport Complex, within approximately a quarter mile of the FAA control tower and offices, and within approximately 250 feet of PNS's most active taxiway.

10.     The North Well is located on the North side of the Airport Complex. Presently, the North Well is not in service due to the circumstances outlined in paragraphs 46 through 48 below.

11.     Since 1981, ECUA has utilized the Wells and Infrastructure to extract ground water from beneath Airport Complex property, treat the extracted ground

-4-

water for potable use, and deliver the treated potable water beneath Airport Complex property to ECUA customers for a fee.

12. At all times material to this complaint, the real property immediately surrounding the Wells and Infrastructure has been depicted on PNS's federal Airport Layout Plan ("ALP").

13. The real property immediately surrounding the Wells and Infrastructure was acquired by the City for aeronautical purposes.

14. Since that acquisition, and at all times material to this complaint, the City has been the fee title owner of the real property immediately surrounding the Wells and Infrastructure.

15. At all times material to this complaint, the City, as an Airport Sponsor, has qualified for and received federal financial assistance through grants under the FAA's Airport and Airway Development Act of 1970, and under the Airport Improvement Program ("AIP") pursuant to the Airport and Airway Improvement Act of 1982, 49 U.S.C. §§ 47101, *et seq.* ("AAI Act"). Under these authorities and associated grant assurances, the City is prohibited from conveying title to real property that is within the Airport Complex and that is depicted on the ALP without the prior permission of and a release from the FAA. *See, e.g.*, 49 U.S.C. § 47151-153; *see also FAA Order 5190.6B*, Chapter 22 (September 30, 2009). This is and has been true at all times material to this complaint.

16.     To obtain a release from the FAA, the Airport Director must certify to the FAA that the property to be released is not needed for present or foreseeable public airport purposes. *FAA Order 5190.6B*, Chapter 22 (September 30, 2009).

17.     At all times material to this complaint, the Airport Director could not truthfully certify to the FAA that the City has no present or foreseeable public airport-related need for the Airport Complex property surrounding the Wells.

18.     Pursuant to federal law and FAA policy, users of real property on the Airport Complex are required to pay the City fair market value compensation for the use of PNS property, and the City, as the Airport Sponsor, is required to use this revenue for the capital or operating costs of PNS. 49 U.S.C. §§ 47107, 47133.

19.     The ECUA is a user of real property that is within the Airport Complex and is depicted on the ALP.

20.     Failure by PNS to obtain fair market value compensation for non-aeronautical uses of PNS real property typically is considered by the FAA to be unlawful revenue diversion, which could subject PNS to FAA penalties that include withholding grants and other federal funds, substantial civil penalties, and a judicial enforcement action for a grant assurance violation. *See FAA Order 5190.6B*, Chapter 16 (September 30, 2009) (citing 49 U.S.C. §§ 46106, 46301, 47107, and 47111).

21.     ECUA was created on July 9, 1981, by a special act of the Florida legislature, a copy of which is attached as Exhibit 1 (the "Special Act"). The intent of the Special Act was to combine the water and sewer systems owned by the City and Escambia County into one utility authority. Ch. 81-376, § 2 at 85, Laws of Fla.

22.     The Special Act required the City to transfer its water system to ECUA, and for ECUA to pay the City $10,000,000 "as fair compensation for the loss of revenues from [the City's] water systems, plus the amount necessary to defease all outstanding obligations of the city with respect to its water and sewer systems." *Id.* at § 7.

23.     Pursuant to and in furtherance of the Special Act, on or around September 10, 1981, the City and ECUA approved and entered into an agreement to effectuate the transfer of the City's water and sewer systems to ECUA (the "Transfer Agreement"), a copy of which is attached as Exhibit 2.

24.     Section 1 of the Transfer Agreement required ECUA to pay to the City $10,000,000.00, plus an amount necessary to defease bonds related to the City's water and sewer system as more particularly specified in the Transfer Agreement.

25.     Section 2 of the Transfer Agreement required the City to transfer to ECUA, upon payment of the compensation provided for in Section 1, "all

properties, both real and personal, improvements, facilities, rights of way and assets of the [City's water and sewer] System."

26.    At all times material to this complaint, the real property immediately surrounding the Wells and Infrastructure has been Airport Complex property and not real property or an asset of the City's former water or sewer systems.

27.    On September 30, 1981, the City issued to ECUA a general Deed and Bill of Sale for the water and sewer systems, which purported to convey: "All right, title, and interests in any properties, both real and personal, improvements, facilities, water and sewer rights-of-way and assets of the water and sewer systems of the City[.]" A copy of this general Deed and Bill of Sale is attached as Exhibit 3.

28.    With ECUA's full knowledge and consent, no real property within the Airport Complex was ever transferred, or identified for future transfer, from the City to ECUA pursuant to the Transfer Agreement or the general Deed and Bill of Sale.

29.    During the transfer process, on January 7, 1982, the PNS Director (Steven Atha) and the ECUA Executive Director (William Spriggs) executed a Letter of Agreement governing ECUA's access to and use of the Hagler Well and the Airport North Well located on the Airport Complex (the "LOA"). ECUA never has disagreed with, objected to, or disputed the existence or validity of the LOA or its terms and conditions. A copy of the LOA is attached as Exhibit 4.

30.   The LOA is the only legal document addressing ECUA's use of or access to the Hagler Well and the Airport North Well, and it grants ECUA permission to access the Wells "for the purposes of operation, maintenance, and repair only . . . ."

31.   The LOA provides that it shall "remain in force and effect until canceled or amended by the Airport Director." To date, the LOA has not been canceled or amended.

32.   Over the next few years, from approximately Spring 1982 to Spring 1985, the City executed, and ECUA accepted, numerous and specific easements and deeds in favor of ECUA to transfer title to, and in some cases easements over, certain parcels of non-Airport Complex real property on or under which elements of the City's water and sewer system were located. In certain instances, elements of the City's water or sewer system were located within the boundaries of City-owned parks (*e.g.*, Osceola Municipal Golf Course, Greenwood Square, and Baars Park). In those instances, the City provided, and ECUA accepted, easements rather than fee simple conveyances by deed.

33.   On May 29, 1982, ECUA's attorney, Robert Kievit, wrote to Assistant City Attorney, John Fleming, concerning the status of the system transfer. Mr. Kievit's letter included a May 11, 1982 letter from C.W. Faircloth, ECUA's Administrative Engineer, which indicated that ECUA thought the Hagler Well site

and Airport North Well site should be conveyed to the ECUA with "[s]ome sort of license or easement . . . to allow access to these sites." Copies of these letters are attached as composite Exhibit 5.

34.    On May 26, 1983, Mr. Fleming, addressing Mr. Kievit's May 29, 1982 letter, wrote:

> [M]y examination of Mr. Faircloth's May 11, 1982, letter reveals only seven more sites which need to be addressed:
>
> . . .
>
> 3. Two well plant sites at Hagler and Airport North. These are airport properties. A written agreement was made by Bill Spriggs and Airport Manager Steve Atha in January, 1982 so that the Authority would have ingress and egress to the sites for maintenance.

At some time subsequent to Mr. Fleming signing this letter, someone hand wrote in the margin of the letter next to this entry the following note: "No Easement. Same would damage airport security as per Airport Mgr."

35.    Mr. Fleming also noted in that letter three other instances where access easements, instead of deeds, would be given to ECUA because water wells were located on City park properties. At the end of his May 26, 1983 letter, Mr. Fleming wrote: "Please let me know if you disagree with any of the foregoing." A copy of this May 26, 1983, letter is attached as Exhibit 6.

36.    On May 30, 1983, Mr. Kievit transmitted Mr. Fleming's May 26 letter to R. Van Loon, ECUA's Executive Director at the time.

-10-

37.     On July 27, 1983, Mr. C.H. Wigley, Jr., ECUA's Assistant Executive Director, wrote to Mr. Kievit regarding "Real Property Conveyances from the City." Mr. Wigley informed ECUA's attorney that easements, and not necessarily warranty deeds, to the PNS well site properties, and certain City park properties, would be acceptable to ECUA. A copy of the July 27, 1983 letter is attached as Exhibit 7.

38.     On September 15, 1983, Mr. Fleming wrote to Mr. Kievit, stating: "Respecting the other comments in Mr. Wigley's [July 27, 1983] letter . . . I have forwarded those letters to the City staff for comment . . . ."

39.     The City's available property transfer records contain a property list with the following note at the top of the first page: "Reference July 27, 83 – Letter Wigley to Kievit. Attached Your Sept. 14. Letter." This property list includes the following entry:

(14) <u>Well Plants on Airport Property – Hagler Field</u>

Access Agreement to both Well sites signed on January 7, 1982. Copy attached hereto. (Exhibit B)

Note:
We recommend that nothing more be done. To provide an easement on each of the Well sites would require F.A.A. approval which could be difficult to obtain due to the possible degradation of Airport security measures.

Subsequent to the creation of this property list, someone hand wrote the following margin note next to this entry: "Airpt. Mgr. does not recommend easements on

either plant site or lines." Below this note is another note: "City Mgr. OKs 10/27/83." A copy of this property list is attached as Exhibit 8.

40.    On January 3, 1984, Mr. Wigley wrote to Mr. Kievit regarding "Real Property Conveyances from the City." Mr. Wigley referenced ECUA's July 27, 1983 letter (*see* Exhibit 7) and mentioned several easements transferred to ECUA by the City, but made no mention of the Hagler Well or Airport North Well.

41.    On January 5, 1984, Mr. Kievit wrote to Mr. Fleming regarding the property conveyances, but made no mention of the Hagler Well or the Airport North Well.

42.    On March 12, 1985, Mr. Kievit again wrote to Mr. Fleming regarding the property conveyances and the need to complete the transfer, again with no mention of the Hagler Well or the Airport North Well. Mr. Kievit wrote: "The following may not be an exhaustive list, but it includes those of which we are aware without making a detailed search." Mr. Wigley is copied on the letter.

43.    In numerous subsequent letters, memoranda, and other documents from 1989, 1992, 1995, 1997, 2010, and 2012, ECUA acknowledged either that it had no easement to the PNS well sites or that the City owned the sites.

44.    The documents discussed above and the behavior of ECUA and the City following the execution of the Transfer Agreement modified or clarified the terms of the Transfer Agreement related to the Hagler Well and the Airport North

Well and confirmed ECUA's agreement to accept the LOA in lieu of fee simple deeds or easements for any real property surrounding the Hagler Well and the Airport North Well.

45.     In reliance on ECUA's actions and inactions related to the 1981 Transfer Agreement, the LOA, and the real property surrounding the Hagler Well, the Airport North Well, and the Infrastructure, the City has accepted numerous federal and state grants and related grant assurances for PNS since 1981.

46.     Over 25 years later, in May 2011, ECUA staff discovered that ECUA had spilled 110 gallons of concentrated fluorosilicic acid onto the ground at the Airport North Well. This contamination leached into the soil beneath the spill.

47.     Subsequently, by letter dated August 30, 2012, ECUA notified PNS that "ECUA operates and maintains three (3) water production facilities *on City of Pensacola (Airport) property*" (emphasis added) and that ECUA was "planning to conduct significant work" at the Airport North Well, including removal of the soil in close proximity to the well containing the contamination, to achieve "Total Closure" of the site with the Florida Department of Environmental Protection ("DEP"). A copy of this August 30, 2012 letter is attached as Exhibit 9.

48.     At some subsequent point in time, ECUA determined that it would be much cheaper for it to leave the concentrated fluoride contamination in the soil and simply record a restrictive covenant over the real property surrounding the Airport

North Well to obtain site closure. However, ECUA could not provide to DEP the required proof of ownership of the property to allow ECUA to record the restrictive covenant.

49.    In its efforts to impose a restrictive covenant on the real property surrounding the Airport North Well, ECUA apparently asked its attorneys to review the ownership status of the site. On April 11, 2013, ECUA's attorney informed ECUA's Director of Water Production, Tom Dawson:

> We have learned that there have been no easements to ECUA for two of the wells [Airport North and Hagler Wells] since 1958. Although the search is not complete, I wanted to update you and let you know that it is unlikely that we currently have any remaining legal access to the wells via recorded easements.

A copy of this April 11, 2013 e-mail is attached as Exhibit 10.

50.    The next day, April 12, 2013, ECUA's attorney also informed Mr. Dawson: "Although the title search is not complete, it is unlikely that there are any recorded deeds providing legal ownership of the airport well properties to ECUA. Currently, we are reviewing our file regarding the initial transfer agreement." A copy of this April 12, 2013 e-mail is attached as Exhibit 11.

51.    On May 15, 2013, ECUA's attorney hand-delivered a letter to the City Attorney requesting that the City convey the Hagler Well site and the Airport North Well site to ECUA. In support of that request, ECUA's attorney enclosed and referred to a copy of the Transfer Agreement and a December 8, 1983

Amendment to City Transfer Agreement, but made no mention of the LOA or any of the above-mentioned correspondence sent subsequent to the Transfer Agreement concerning the Hagler Well and the Airport North Well.

52.    Thereafter, on or about June 13, 2013, ECUA's attorney sent legal descriptions of certain real property surrounding the Hagler Well and the Airport North Well to the City Attorney and suggested that deeds to the property be delivered by the City to ECUA.

53.    On numerous occasions thereafter, the City declined to execute deeds to the real property surrounding the Hagler and Airport North Wells, citing the actions of the parties subsequent to execution of the Transfer Agreement and the City's inability to convey Airport Complex property because of federal law and FAA grant restrictions.

54.    ECUA persisted in its demand that the City convey to it real property surrounding the Hagler Well and the Airport North Well and subsequently insisted that the City request approval of the conveyance from the FAA.

55.    Accordingly, at ECUA's insistence, counsel for the City asked the FAA whether it would approve the conveyance to ECUA of fee simple title to real property surrounding the Hagler Well and the Airport North Well. The FAA informed counsel for the City that the FAA would not approve the conveyance, and the City's counsel so informed ECUA.

56.    As a result of the inquiry, the FAA expressed concern to the City about whether ECUA has been and is properly compensating PNS for the use of Airport Complex real property and ECUA's extraction, delivery, and sale of water from the Airport Complex property.

57.    In explanation and clarification of its position, the FAA sent the City's counsel a copy of a November 18, 2014 Memorandum from the FAA's Office of the Chief Counsel concerning a similar situation at the Vero Beach Municipal Airport that is sponsored by the City of Vero Beach, Florida. A copy of this Memorandum is attached as Exhibit 12.

58.    Thereafter, on July 15, 2015, the FAA sent a letter to the PNS Interim Airport Director "to remind you of your federal obligations with regard to the sale of water taken from the airport." This letter included and referenced the Memorandum described above, which sets forth the legal opinion of the FAA's Office of Chief Counsel "that consistent with the Revenue Use Policy, water is a revenue-creating source on federally obligated airports. Any revenue derived from the sale or lease of rights in that water is airport revenue." This letter further provides:

> We strongly encourage the City to develop a lease or agreement with the ECUA to memorialize the terms associated with the water wells at PNS. This document should establish the base Fair Market Value rate for the ECUA's use of airport property and any water sold consistent with the Revenue Use Policy.

A copy of the FAA's July 15, 2015 letter to PNS is attached as Exhibit 13.

59.     Subsequently, the FAA provided to the City's counsel a copy of the FAA's October 20, 2015 letter to the City of Pompano Beach that reiterated the FAA's legal position that the airport sponsor must be compensated for the water extracted from beneath airport complex property. A copy of this October 20, 2015 letter is attached as Exhibit 14.

60.     The aforementioned FAA policy, enforcement, or guidance documents and memoranda (Exhibits 12, 13, and 14 attached hereto) regarding the extraction and resale of water from airport complex property by non-aeronautical users are collectively referred to herein as the "Water Extraction Policies."

61.     The FAA provided copies of the Water Extraction Policies to the City.

62.     The City provided copies of the Water Extraction Policies to ECUA.

63.     On February 19, 2014, the City sent ECUA a public records request (the "PRR") to ensure that there were no documents in ECUA's possession, custody, or control that could support ECUA's claim that it owns the real property surrounding the Airport North and Hagler Wells or contradict ECUA actions and inactions regarding the Wells, the 1981 Transfer Agreement, and the general Deed and Bill of Sale. ECUA confirmed receipt of the PRR by letter dated February 24, 2014. Copies of that PRR correspondence are attached as composite Exhibit 15.

64.     Late in 2013, ECUA unilaterally instituted a proceeding under the Florida Governmental Conflict Resolution Act, Chapter 164, Florida Statutes (the "Act"). The City and ECUA have attended two separate pre-litigation mediation sessions regarding the matters set out in this complaint, and both have resulted in an impasse. As a result of the City and ECUA's failure to resolve the conflict through the procedures provided by the Act, the City and ECUA may avail themselves of any otherwise available legal rights.

**COUNT I**
**Declaratory Relief**

65.     The City realleges and incorporates the allegations in paragraphs 1 through 64 of this complaint.

The Parties' Contentions

**A. ECUA's Contentions**

66.     The City is informed and believes that ECUA contends the 1981 Transfer Agreement contains a currently enforceable obligation of the City to transfer fee title to real property surrounding the Airport North and Hagler Wells to ECUA without regard to the federal grant assurances and the AAI Act.

67.     The City is informed and believes that ECUA contends, in the alternative, that the general Deed and Bill of Sale was sufficient and effective to convey the real property immediately surrounding the Airport North and Hagler

-18-

Wells without regard to subsequent actions of the parties, Florida law, the federal grant assurances, or the AAI Act.

68.     The City is informed and believes that ECUA contends it does not owe the City fair market value rent for a ground lease or compensation for the water it extracts and sells from the Wells, because ECUA already owns the real property surrounding the Airport North and Hagler Wells by virtue of the Transfer Agreement or the general Deed and Bill of Sale without regard to the federal grant assurances, the AAI Act, and the Water Extraction Policies.

69.     The City is informed and believes that ECUA contends the City breached its warranty in the Transfer Agreement in 1981, or at some other unspecified time thereafter, by not being able to transfer the real property surrounding the Airport North and Hagler Wells without FAA approval.

70.     The City is informed and believes that ECUA originally contended it needed fee title to the Airport North Well in order to place restrictions on the real property surrounding the well so ECUA could avoid cleaning up the environmental contamination it caused at the well. Subsequently, ECUA has expressed to the City that it needs to own the real property surrounding the Airport North and Hagler Wells so it can never be displaced by the City from those sites, even though the City may need the sites in the future for aeronautical purposes.

## B. The City's Contentions

71.     In addition to, and not in limitation of, its other allegations contained in this complaint, the City contends:

(a) The City denies ECUA's contentions in paragraphs 66 through 70 and contends that an actual conflict exists between ECUA's demands and contentions and the City's federal grant assurances and federal law, rendering it impossible for the City to comply with both ECUA's demands pursuant to the 1981 Transfer Agreement and the FAA's federal grant assurances and federal law; compliance with ECUA's demands regarding the 1981 Transfer Agreement or the general Deed and Bill of Sale would completely frustrate the objectives and intent of the AAI Act;

(b) The City's compliance with ECUA's demands regarding the 1981 Transfer Agreement and the general Deed and Bill of Sale would violate its federal grant assurances and is preempted by, and subordinate to, the Supremacy Clause because it directly conflicts with the legal relationship between the FAA and the City under the AAI Act. Specifically, the City contends that the conflict arises from the following:

i.  Section 47107(a)(16) of the AAI Act precludes the City from modifying its ALP without the approval and consent of the FAA. Under this section of the AAI Act the City, as the airport sponsor, is required to "not make or allow any alteration in the airport or any of its facilities if the alteration does not comply with the [ALP] the [FAA] approves, and the [FAA] is of the opinion that the alteration may affect adversely the safety, utility, or efficiency of the airport." 49 U.S.C. § 47107(a)(16)(C).

ii.  Section 47107(c) of the AAI Act defines when land is needed for airport purposes, and thus cannot be disposed of by an airport sponsor without the consent and approval of the FAA. According to this provision, land is needed for an airport purpose "if the land may be needed for an aeronautical purpose . . . ." 49 U.S.C. § 47107(c).

iii.  The City's transfer of the property surrounding the Airport North and Hagler Wells would violate both federal provisions noted above, because it would: result in modifications to the ALP without FAA approval; alter the Airport in contravention of the ALP and contrary to the FAA's stated position that the

parcels are needed to protect the Airport's safety, utility, and efficiency; and result in a violation of the prohibition against disposal of land prior to a determination from the FAA that the property is no longer needed for aeronautical purposes.

(c) That, as a direct result of the federal requirements imposed upon it as an airport sponsor, a direct conflict exists between ECUA's demands and contentions and the federal requirements, resulting in an impossibility of compliance by the City with both the federal law and grant agreements and the 1981 Transfer Agreement or the general Deed and Bill of Sale, both of which emanated from the Special Act and the City's subsequent approval of those documents. Also, these conflicts interfere with the federal purpose underlying the AAI Act by undermining the federal aviation system and the federal funds expended in furtherance of that system.

(d) Even if the the 1981 Transfer Agreement and the general Deed and Bill of Sale are not federally preempted, those documents, and all causes of action brought thereunder, are unenforceable and void by virtue of ECUA actions, inactions, the passage of time, lack of consideration, and multiple other defenses available to the City under Florida law.

(e) Even if the general Deed and Bill of Sale is not federally preempted, it does not contain any legal description of any real property to be conveyed by the City to ECUA. Specifically, the Deed and Bill of Sale does not contain any legal description of any real property surrounding the Hagler Well, the Airport North Well, or any Improvements, nor did there at the time of execution exist any deed or conveyance of record to which reference could be made to ascertain these legal descriptions. Because of these defects, the Deed and Bill of Sale as a matter of law did not convey any real property surrounding the Hagler Well, the Airport North Well, or any Improvements.

(f) The federal grant assurances, the AAI Act, and the Water Extraction Policies appear to dictate that the City should: i) cancel or amend the LOA; ii) require ECUA to enter into a lease and concession agreement that is FAA-compliant; or iii) with adequate notice to ECUA, terminate the LOA if ECUA remains unwilling to promptly enter into an FAA-compliant lease and concession agreement.

(g) The comprehensive federal statutory and regulatory scheme of the AAIA Act over the Airport Complex property and the access, control, transfer, and use thereof demonstrates the dominance of the federal

interest in the Airport Complex property, including without limitation the safety, utility, and efficiency of PNS.

## C. FAA's Contentions

72.    The City is informed and believes that the FAA contends the comprehensive federal statutory and regulatory scheme of the AAIA Act over the Airport Complex property and the access, control, transfer, and use thereof demonstrates the dominance of the federal interest in the Airport Complex property, including without limitation the safety, utility, and efficiency of PNS.

73.    The City is informed and believes that the FAA contends the real property depicted on the ALP and immediately surrounding the Wells and Infrastructure, from the time of the Special Act until now, is not subject to sale or transfer without FAA approval.

74.    The City is informed and believes that the FAA contends that, if ECUA does not own the real property surrounding the Airport North well, the Hagler Well, and the Infrastructure, then, as part of the calculation of fair market value rent, ECUA would owe the City fair market value rent for a ground lease and compensation for the water ECUA extracts and sells from the Wells.

75.    The City is informed and believes that the FAA would contend that ECUA's position, as alleged in paragraphs 66 through 70 above, is incorrect.

76.   Further, the City is informed and believes that the FAA would contend:

(a) The Transfer Agreement and general Deed and Bill of Sale are preempted by and subordinate to FAA statutes, policies, and the federal grant assurances between the City and the FAA;

(b) The City will not be granted a release from the FAA regarding the real property surrounding the Wells and Infrastructure because the subject parcels are needed for the aeronautical purposes for which they were acquired;

(c) The City cannot unilaterally sell or otherwise dispose of the real property surrounding the Wells and Infrastructure, nor authorize non-aviation uses on those parcels, without violating federal law and the FAA grant assurances that were entered into prior to the Special Act and thereafter; and

(d) The LOA does not sufficiently impose upon ECUA all current FAA laws, regulations, and policies governing ECUA's use of and access to Airport Complex property.

<u>Additional Count I Allegations and Prayer for Relief</u>

77.   There is an actual, substantial, and continuing controversy between the City, ECUA, and the FAA, and a judicial declaration of rights is both necessary

and appropriate in that ECUA asserts rights to, but has no present right, title, or interest in or to, PNS real property, except those rights granted in and subject to the LOA.

78.     There also is an actual, substantial, and continuing controversy between the City, ECUA, and the FAA as to whether ECUA can require the City to transfer real property immediately surrounding the well sites to ECUA in the absence of a certification by the City that it has no present or foreseeable public airport-related need for the well sites and a release from the FAA, and without paying the City the fair market value of the sites.

79.     The City is being injured by this controversy created by ECUA's claim of entitlement to ownership of the Well sites and the contradiction of ECUA's claim with the AAI Act, federal laws, and associated grant requirements and assurances, and by ECUA's refusal to enter into an FAA-compliant agreement with the City.

80.     At the time when the City and ECUA approved and entered into the 1981 Transfer Agreement, and when the City approved and executed the general Deed and Bill of Sale, the City and ECUA were governmental utility entities and were conducting themselves as such in their regulatory capacity.

81.     The City has been placed in a position where it could be subjected to a revenue diversion enforcement action by the FAA in the event the City does not

obtain fair market value compensation from ECUA for ECUA's use of, and extraction and delivery of water from, the Hagler and Airport North Wells, the Infrastructure, and the PNS real property surrounding the Wells and Infrastructure.

82.    The City is incurring attorneys' fees and costs in dealing with ECUA and the FAA in an effort to resolve the controversies and claims presented in this action.

83.    The City's injuries can be redressed by a judicial declaration of the parties' rights and obligations that ultimately would resolve these controversies and determine whether, under federal law, ECUA must enter into an FAA-compliant agreement with the City regarding the Wells and Infrastructure, and by the Court granting the relief requested below.

WHEREFORE, the City of Pensacola respectfully requests that the Court enter a judgment:

(A)    Declaring that the LOA is a valid contract that is enforceable in accordance with its terms;

(B)    Declaring that ECUA has no right, title, or interest in or to the PNS real property surrounding the Hagler and Airport North Wells, except those rights specifically granted in and subject to the LOA;

(C)     Declaring that, due to federal preemption or otherwise, the City has no unilateral authority to convey title by deed to ECUA for any amount of PNS real property surrounding the Hagler and Airport North Wells or the Infrastructure;

(D)     Declaring that ECUA has no right under federal law, Florida law, the Special Act, or the Transfer Agreement, as modified, to demand that the City convey title by deed to ECUA for any amount of PNS real property surrounding the Hagler and Airport North Wells or the Infrastructure;

(E)     Declaring that the City has fully performed its obligations to ECUA under the Special Act and the Transfer Agreement, as modified, regarding the Airport North and Hagler Wells and all Airport Complex real property;

(F)     Declaring whether ECUA must enter into an FAA-compliant agreement with the City regarding the Wells and Infrastructure and pay the City fair market value compensation for its use of, and production and delivery of potable water to its customers from, Airport Complex property;

 (G)    Declaring whether the City, as an Airport Sponsor, is legally obligated to impose on and collect from ECUA a percentage of customer revenues according to the FAA's Water Extraction Policies, in addition to appropriate ground lease or easement charges;

(H)     Granting any injunctive relief necessary and in conformance with the Court's declaratory judgment;

(I)     Granting the City its costs; and

(J)     Granting the City such further relief as the Court may deem appropriate.

Dated this 10th day of May, 2016.

/s/ John L. Fiveash
John L. Fiveash
Florida Bar No.: 716571
Edwin A. Steinmeyer
Florida Bar No.: 883920
STEINMEYER FIVEASH LLP
310 West College Avenue
Tallahassee, Florida 32301
Telephone: (850) 270-6990
jlf@steinmeyerfiveash.com (primary)
eas@steinmeyerfiveash.com (primary)
jrs@steinmeyerfiveash.com (secondary)

-and-

John P. Daniel
Florida Bar No.: 784291
Ralph A. Peterson
Florida Bar No.: 303021
BEGGS & LANE, RLLP
Post Office Box 12950
501 Commendencia Street
Pensacola, Florida 32502-5953
Telephone: (850) 432-2451
jpd@beggslane.com (primary)
rap@beggslane.com (primary)
msk@beggslane.com (secondary)
brm@beggslane.com (secondary)
jd@beggslane.com (secondary)

*Attorneys for Plaintiff City of Pensacola*